The next matter, number 161442, United States X-Rail, Antony Nargol v. DePuy Orthopaedics, et al. Thank you. Mr. Kornblith, good morning. Good morning, Your Honors, and may it please the Court. Russell Kornblith on behalf of the relators in this case, Dr. Antony Nargol, Dr. David Langdon. I'm here with my co-counsel, Ross Brooks. With the Court's permission, I'd like to reserve five minutes for rebuttal. Mr. William. Thank you, Your Honor. This is a case about a hip implant that the defendants knew that they could not manufacture to be safe. Which implant are we dealing with? That seems to be – I'm having trouble figuring it out from the complaint in the briefing. Your Honor, in this case, the claims pertain to the Pinnacle metal-on-metal hip implant. And I know there's some question in the papers as to whether the references to Pinnacle refer to the metal-on-metal device. I would direct the Court to paragraph 176 of the second amended complaint, which does define that term. And by that, do you mean there's a reference to an M specification head and Ultramet minor? Correct, Your Honor. And that's one of various different types of hip replacement products that the defendant sells. That's correct, Your Honor. But the case is only about this one. That's correct. And the District Court acknowledged that, and the defendants have acknowledged that as well. But the District Court said your allegations of fraud pertain to a whole variety of Pinnacle products and Pinnacle hip replacements. And you refer to numerous products. And then when you get to your penultimate or ultimate allegations, you don't say which one it is. Well, respectfully, obviously, we disagree with the District Court on that determination. So the District Court referred to that, I believe, specifically in context of the representative false claim that the relators have pleaded in this case for the patient, FI. And you'll see if you look at that, in paragraph 418 of the second amended complaint, the relators allege that the surgeon in this case, Dr. JN, relied on misrepresentations specific to the metal-on-metal device. Specifically, they say that we allege that the marketing materials that he had received suggested that were less rare than conventional devices. His reliance on that specific fact about the metal-on-metal device, the only reasonable inference to be drawn from that is that it was a metal-on-metal device that he opted to implant into the patient, FI. This court held in Duxbury that a relator has to plead sufficient factual or statistical evidence to strengthen the inference of fraud beyond mere possibility. And the relators in this case have done just that. Actually, there's a little more to that. Yes, Your Honor. And I'll just read from a later case. And that's sufficiently to establish that false claims were submitted for government payment as a result of a defendant's alleged misconduct. And I would like you to tell me where in the complaint it does that. Yes, Your Honor. So in terms of the misconduct, I would point out that the district court did find that the relators had sufficient allegations of misconduct. It says so about page 2 of its opinion. The relators in this case have pleaded a claim that is representative of the defendant's fraud. Specifically, the relators pleaded in paragraphs 414 through 430 that on or around November 12, 2007, Dr. JN implanted a pinnacle metal-on-metal hip implant into a patient FI at Stony Brook University Medical Center in New York and that New York Medicaid reimbursed 50% of the cost. The relators pleaded that this was a false claim for two major reasons. First, the relators pleaded that the device in this case, the metal-on-metal device, did not conform to FDA-mandated safety specifications that specified that the device had to have a certain diametrical clearance. And as a result, the device failed. Second, the relators pleaded two sets of false statements that rendered this a false claim under subsection A1B of the False Claims Act. The first one is the one that I referenced earlier in response to Judge Keada's question, the false statement about metal-on-metal devices experiencing less wear than conventional products. The second set of false statements suggested, and these were false statements in the pinnacle's instructions for use and its product label, that the device could be safely implanted in accordance with the instructions that were given to the surgeons. What we say is that absent these statements, neither that surgeon, nor for that matter any reasonable surgeon, would have opted to implant the pinnacle metal-on-metal device. Beyond the representative false claim, Judge Storia, to return to your question, the relators have pleaded that the defendants caused Medicare to pay for 18,750 of these devices between 2005 and 2009. And the relators have pleaded that New York Medicaid reversed 850 of these devices between 2005 and 2010. If you can come back to the one example you cite in the complaint, as I understand one of your theories is that something like 15% of the metal-on-metal hip replacements did not meet the actual specifications that were approved by the FDA. Your Honor, we actually allege that 50% of the liners, so it's a hip implant, it's got a liner and it's got a head. We allege that approximately 50% of the liners did not conform and approximately 15% of the heads did not conform. And so what evidence is there that the one used in that example that you give was one of the ones that fell outside the specifications? So this is based on our relators' scientific expertise. The relators in this case are world-renowned orthopedic surgeons. But I don't think they claimed to ever look at this particular implant. I mean, you're talking about one implant. It is correct. And how do we know that it was within or without specifications? Because if it was not without specifications, your whole theory on that falls. We don't have a false claim on that theory. Well, I thought your theory was that because of the 15% 50 that it would never have been approved in the first place, therefore none of them would have come to market. It is both theories, Your Honor. And I would point out in this regard that the district court hasn't made a decision on the 12B6 issue, I think quite rightly so, because this court's recent decision in the Escobar case actually kind of changes the 12B6 theories that would be available to us here. But it is both theories. So one theory is that had they told the FDA the truth about their ability to manufacture this device to specification and the safety regarding it, what they knew about the safety and their ability to produce it safely, that the FDA would have never approved it. And that even if the FDA had approved it, that had they told surgeons the truth about it, no surgeon would have implanted it, both of which are preconditions to payment in this case. But, Judge Keada, to return to your question, the relators are medical experts in this case, and their best assessment of why the device in patient FI failed is that it failed because it had a nonconforming diametrical clearance. Now, it may be that that was not the case, but we are only at the pleading stage, and we are required at this stage under the SEC v. Tambone case, cited in our briefs, to indulge all reasonable inferences in favor of the relators. I do want to also briefly touch on the error that the district court made with regard to the A1A v. A1B claims, because it's an error that the defendants, I think, acknowledge in footnote 10 of their briefs, which is that the district court did not understand that indirect claims may be submitted under subsection A1A of the False Claims Act, and may be submitted indirectly, which Duxbury says a more flexible Rule 9b standard obtains to. In that case, Judge Thompson, to return to your question, the claim would be false because it does not conform to the FDA-approved specifications. It's actually called a clearance in this case. But the claim could also be false under subsection A1B, because there were false statements material to the false claim. And in this case, we've alleged that two sets of false statements that were material to the FI claim. Now, materiality, this court's just redefined, I think, a little bit in the Escobar case, and I think it's actually very important for this case. The district court said that the relators in this case have to plead that the surgeon, Dr. J.N., actually relied on misrepresentations. What this court said in Escobar is that that is one way to prove materiality, but that materiality, it's actually a very, very nuanced opinion. Materiality actually asks that had the decision maker known of the noncompliance with certain regulations, would the district court have, or would the surgeon have found that, or the decision maker have found that noncompliance to be material? So in this case, that asks had the surgeons known that 50% of the liners were out of specification, that 14% of the heads were out of specification, and that the devices failed at five times the rate that the defendants represented them to fail to the government, would either the surgeons or the FDA have still made the decision to clear the device? And I think that the answer is very clearly no. The final error that the district court made that we haven't yet discussed is that the district court dismissed out of hand the relator's theory of total falsity. Under this theory, all claims submitted since 2005 would be false, and in keeping with the standard of Duxbury and the Grubbs case cited therein, the relators would just have to prove that there were in fact claims for the pinnacle device submitted since 2005. That would seem to come very clearly from both the JM claim in this case, as well as from the statistical evidence in this case. The district court, however, deployed Rule 9b as a substantive constraint on the False Claims Act, which was a violation of the Rules Enabling Act. I'll reserve the rest of the time for rebuttal with the court's permission. Thank you. Mr. Sellers, good morning. Good morning. Good morning. If it pleases the court, my name is Mark Seltzer. I represent, together with my colleague, Hanna Bornstein, DePue Orthopedics and Johnson & Johnson Systems, Inc. I first wanted to address Judge Kayada's question relating to the single false claim that is pled, the single claim that is pled for payment in this complaint, which is the claim relating to patient FI and Dr. Joann. At paragraph 414, if I could direct the court's attention to paragraph 414 of the complaint, you will note, as Judge Saylor found in great detail in his substantial opinion on the motion to dismiss, that the relators do not plead with particularity a pinnacle metal-on-metal device. Now, why is that critical in the context of this litigation, and why did Judge Saylor find it to be critical? The relators plead any number of iterations in their complaint of various hip replacement devices, including relating to the pinnacle hip replacement system. From a notice perspective, we are unable to parse through the complaint, as Judge Saylor was unable to, to determine with any degree of precision as to whether the relators were pleading a ceramic device, or another type of a device. Indeed, Judge Saylor found that there are three iterations of the device. Well, as I understand it, the counter-argument, I think you're correct when you say about 414, it says, what, pinnacle product. This is a pinnacle device, Your Honor. But I think the argument we just heard is if you look at the surrounding allegations, they allege that this doctor relied on the representations regarding metal-on-metal devices. So, therefore, the argument is we should infer that they meant, when they said pinnacle device, they actually meant the metal-on-metal one. Well, first, Judge Keogh, in connection with the first point of your question, in that specific allegation, that specific paragraph, the relators do not plead that this particular doctor relied on any particular false statement. They make gross, bald, and conclusory allegations throughout the complaint of false statements and false representations made to surgeons and to the FDA, but they don't plead with precision as to which false statements this doctor reportedly relied upon. So, if I understand it, we need to look back at these allegations around 414 and see if there's one in which they say this doctor relied on the metal-on-metal representations. Then we might infer that the device they're referring to that he used was metal-on-metal, but you're telling us we won't find that allegation. One, you will not find it. Number two, I think it would be unreasonable here. I mean, there is case law in the circuit that inferences, reasonable inferences can be drawn based on the face of the allegations, but this would be an unreasonable inference. I think you need to look at the complaint in its totality. There are hundreds of allegations put in the complaint. If you parse through it carefully, you'll see that there are references to any number of pinnacle-related devices and various iterations of that device, and I don't think you can extrapolate from allegations outside of that particular paragraph that Dr. J.N. would have relied upon a false statement relating to a pinnacle metal-on-metal device. And then, again, that is important from a notice perspective. It would be extraordinarily difficult for DePuy to defend this complaint given the array of allegations made as to a whole host of different iterations of the pinnacle system. I think they're also saying that, well, even if they didn't properly allege under 9b a fraudulent transaction involving Dr. J.N., they've alleged that every sale or every payment for every one of these products was always a false claim, a total falsity type theory, I think is what they call it. How do you respond? I think, Your Honor, Judge Cayetano, our view is that the total falsity theory that the relators have alleged is deficient on three reasons, both as a matter of fact, because they don't see it in their complaint. They don't believe total falsity in their complaint. If you look at the allegations in the complaint, Your Honor, you will see allegations relating to a 15% failure rate. That's not total falsity. What about the other 85% of certifications or claims that purportedly were made as to the other 85% of the devices? Well, do you disagree with their assertion that 15% was high enough so that it would never have gotten FDA clearance? We do take issue with that, Your Honor, number one, and that would be an issue that we would have to develop later as a matter of law and as a matter of fact. But, Your Honor, Judge Thompson, this is not a case where the relators are alleging that the device was 100% worthless. It's not that kind of case, number one, and number two, this is not a case where the FDA was in the dark. But they're saying that it was worthless enough so that if it had this kind of failure rate, it wouldn't have gotten clearance. Number one, that allegation is contradicted by other factual assertions they make in the complaint. Did the FDA ever withdraw approval? It did not. It did not, Your Honor, and that, Judge Thompson, that was the point I was trying to make respectfully, which is that if you parse through the allegations in the complaint, the FDA was on notice. They were on notice of a number of these purported allegations relating to false statements and misrepresentations because they had, according to the relators, several meetings with the relators, time and time again they met with the relators of the FDA. At some point the device was withdrawn from the market. No, it was discontinued, Your Honor. The device was discontinued by Deque voluntarily for economic, for business reasons, because that particular device simply was not selling. But there's no allegation in the complaint that the FDA required them to withdraw the device. Every allegation made in this complaint, they alleged the FDA knew about it. They alleged the FDA knew about it. Are you saying that this is not a situation where, but for their voluntary withdrawal, the FDA would have been there saying it's time to get this off the market? That's not consistent with the allegations or with the record, Your Honor. Let me just speak to the other points why I believe this theory of total falsity fails. One, I believe it's factually incorrect. It's contradicted by the allegations in the complaint, particularly because the FDA never withdrew the device, despite being on notice of all these allegations. And second, because they haven't pleaded as a total falsity case. They do not plead that this device was 100% worthless. Second, as a matter of law, Your Honors, a theory of total falsity would counterman the entire framework that this court has created since Rivera, since Stoxbury. It's been rejected specifically by this court. This kind of per se standard has been rejected by this court in Rivera. And it stands in contrast to the court's recent case law in Kelly and in Lawton. The relators are asking you to set aside the Duxbury framework and the notion that the False Claims Act violation is predicated on the making of a claim for payment, a false claim for payment, that that is the sine qua non of a False Claims Act violation. They are arguing that that can be set aside, set aside, and that they are entitled to make reasonable inferences that because payment was made, that reimbursement was provided, that they do not need to establish that there was a false claim made for payment. Suppose I'm a manufacturer and I manufacture 100,000 medical devices, and I know that 75,000 of them don't conform to the specifications. I've actually substituted a cheaper metal in a less defective. It's a pure fraudulent scheme type situation. But 25% of them are still okay. If we put into evidence, and you couldn't tell it was defective until a year after you put it in, and hence a year after you submitted a bill, wouldn't it be virtually certain that we could say in that situation that the government must have reimbursed for some of those, given the way the medical care system works in the country? If you've got 100,000 devices, 75,000 defective, and no doctor would be able to know they were defective when he used it, isn't that not just beyond possibility, but isn't that statistically certain? Does that strengthen the inference that a false claim may have been made? I believe it would, but they don't do that here. They don't have 75%. They have either 50 or 15, depending on what issue. But actually, the statistics would lead you to the same conclusion. If only 15% of them were defective, but you sold 10,000, with the government paying, generally, nationally, 50% of bills, say, it doesn't take, you know, you don't need a long regression analysis to conclude that there's a certainty that at least some of those would have been paid for by the government. Number one, Judge Karada, in that circumstance, aren't the relators still, in that kind of context, aren't they still required to plead their statistical allegations with some degree of particularity? If you look at the statistical allegations here, Your Honor, they are, as Judge Seller found, all over the place. They are entirely unfocused, without any kind of precision. Well, if we look, and the complaint does appear to be all over the place, but if we find through a thread of one particular product with a high volume of sales, with a defect percentage that we can do these back-of-the-envelope calculations like you would 2 plus 2, then what would your response to that be? Would that be adequate, assuming we find the JN one itself not specific enough? My view is, Your Honor, that it would not be adequate. Why is that? Because of the view that they still have to plead, putting aside the statistical allegations, they still have to plead a connective tissue to the making of a false claim for payment. Don't they just have to show that the making of a false claim was, well, let's say the standard was virtually certain. Wouldn't they have shown it was virtually certain? I don't believe so, Your Honor. Not in that circumstance. I think what they are advocating here, Your Honor, is automatic liability for simply pleading raw statistical allegations. And the framework that this Court has created in Duxbury and in Lawton and in Gee and in Kelly requires them to plead those statistical allegations with much more precision than Judge Cayada, than you are suggesting in your hypothetical. There still is a particularity requirement that must be pled in order to satisfy Rule 9b. In fact, I think as a matter of policy, Your Honor, Judge Salos anticipated that kind of point, that if that form of automatic liability or per se liability attaches for pleading these kinds of borrowed statistical allegations, then virtually every products liability case that is litigated in the courtrooms below here would be, as a matter of law, a False Claims Act violation. And to me, Your Honor, as a matter of policy, that's not what Congress intended in the question of the statute. Why is that? If it indeed is a defective product and if it was widely distributed so we know the government and people wouldn't have known when they were using it that it was defective, so therefore they would have put in reimbursement requests, why shouldn't there be a False Claims Act if there really was fraud? Your Honor, if it is pled with the type of precision that is contemplated by this court, maybe under certain circumstances it wouldn't be actionable. But we submit, Your Honor, that they have simply not done that here. They have not pled their statistical allegations with any degree of precision. They haven't established a connection between the statistical allegations and the making of a false claim for payment. In the limited time that I have left, I do want to address the notion that Judge Sorma had committed error by mislabeling A1A and A1B of the statute. If you look at his opinion and you look at his carefully drafted opinion rejecting the motion for reconsideration, it is clear that he is applying the Duxbury analysis here. It is clear that he is applying the Duxbury analysis in reaching his conclusion that the indirect claims do not pass muster under A1A. And finally, in the nine seconds that I have left, Your Honor, Judge Sorma did not impose an alliance requirement.  and found that their theory of but-for causation is not satisfied by the allegations in the complaint. Thank you, Your Honor. We rest our brief. Thank you. May it please the Court. A little bit shorter than Mr. Seltzer. I want to address two aspects of the Rule 9b issue and then I do want to talk briefly about the leave to amend issue before we conclude today. The total falsity question that we have been discussing today is probably a 12b6 issue. It's not an issue that can be decided on the basis of Rule 9b. The District Court, however, purported to say that Rule 9b prevents this Court or any Court from recognizing that a claim for a device may be categorically false, and that was error. We know this because the District Court very explicitly said that it was not considering Rule 12b6 in this case. So to the extent that there is a question as to whether total falsity is a viable theory of liability, this case at the very least has to be vacated and remanded for consideration of that issue. The Escobar case is very helpful on this because Escobar says that we ask not whether there was actual reliance, as the District Court parsed in this case, but whether if the decision-maker knew all of the material facts as they were when they opted to decide the payment, whether the decision-maker would have made the same decision. And we've argued that the answer is no. Now, Judge Thompson, you asked earlier whether the FDA stopped or pulled this product from the market, and it is correct that the product was discontinued before the FDA took action, but I will also note that, as we say in Note 8 to our brief, the FDA has actually changed the approval process for metal-on-metal devices, and it's changed it to make it more stringent in part, we believe, in recognition of the lawyer's contribution to this field. Now, I also want to talk about the purposes of Rule 9b, and I think it's... What about, we just heard from opposing counsel that there, in fact, is not an allocation in the complaint that Dr. J.N. relied on the literature concerning the metal-on-metal. Can you... Yes, so I believe that that comes from Paragraph 420 of the second amended complaint. It's Paragraph 418 that discusses metal-on-metal devices, and Paragraph 420 says that but for Duput's false statements, Dr. J.N. would have chosen a different available device, which is the language from 1395a1a, which governs Medicaid claims. But I do want to discuss briefly the leave to amend issue before we conclude today. The district court held that the relators in this case should have pleaded basically more false claims or more details about specific false claims, and that this information was available to the relators earlier, and so, therefore, it should have been pleaded in an earlier complaint. This was a mistake, and it was a mistake on two levels. First, as this court's precedents, including the Clinger case authored by you, Judge Turaya, made clear, the touchstone of a decision on leave to amend is supposed to be prejudice, and the district court here really gave short shrift to that question. The delay here was actually only one month from the unsealing of the case to the filing of the proposed third amended complaint, which contained 39 representative claims. But even beyond that, there's no cognizable prejudice to the defendants in this case. The defendants admit that they were already on notice as to the allegations that they say should have been included in that third amended complaint. And specifically, the defendants say in note 23 to their brief, oh, well, the relators could have just pleaded information from the MDL, the pinnacle MDL complaints, and that would have shown that, in fact, there were claims submitted to the government for metal-on-metal devices. That being the case, it's hard for me to imagine, in fact, I would submit that there is not any prejudice to the defendants in now holding them to answer for those claims in a Federal False Claims Act suit. But I think the third important point on the... That's not the standard, though, right? Well, I think it is the standard. You have to show good cause. Respectfully, Your Honor, it was a Rule 15 amendment in this case. Neither party below agrees that this was a Rule 16 amendment, so it's a Rule 15 amendment, which means we're still under the Froman v. Davis leave to amend should be freely given standard. And, you know, that's even different. That's an important distinction, I think, from the Kluger case, in which it actually was a Rule 16 amendment, and Judge Tureo, you said in that case that amendments should be given. So you'd say we should continue to apply that standard essentially forever? If we let this amendment complaint put in and the Court finds it's insufficient and you then move to amend again, would it still be said freely given? Your Honor, I do believe until the Blackletter Law, and this is until the Court sets a deadline for the close of amendments, leave to amend should be freely given. Obviously, that could be abused, but we don't believe that that's the case here, and we do believe that the minimum length of time, as well as the prejudice issue, work in our favor on that issue. I thank the Court for its time, and we rest on our briefs for the remainder of our argument. Thank you.